This afternoon, we have two cases consolidated for purposes of oral argument only. Case number 2024-30706, Darcy Roake et al. v. Cade Brumley et al. And case number 25-50695, Mara Nathan et al. v. Alamo Heights Independent School District et al. Judge Dennis is listening on the recording today. You may proceed. Well, thank you, Chief Judge Arroyo. I immediately support. Consent amendments have historical significance as one of the foundations of our legal system. That is what the Supreme Court has said, and that is what the legislature in Louisiana expressly stated in passing H.B. 71. The core question in this pre-enforcement special challenge is whether publicists are prepared to show that there is not a single way that Louisiana can constitutionally implement H.B. 71. They did not. And I think the best evidence of that is that even in their supplemental on-line briefs, they do not dispute that if a school, as H.B. 71 has pledged to do, if a school implements H.B. 71 in the way that Attorney General Merrill's January 2025 guidance letter suggests, that that displays prosecution. And I think that's where exactly they could lose, which is that if you look at the bench exhibits we provided to you, if you look at page 85 of our on-line brief, what we show in the court are four of the myriad ways in which H.B. 71 can actually be enforced. And I think that's important, because remember that anything that's clear from the Supreme Court's decision in Newby echoes this Court's own decision in Brock v. Carey that in a facial challenge, the plaintiff has a disciplinary burden, which is to show that there is not a single way that a government can constitutionally implement the challenge law. Now, what we show you in those exhibits are important because what H.B. 71 does is it sets up for, it certainly sets minimum requirements, and again, this text has to be on the discipline, it serves minimum size requirements, but after that, it says that it's up to the school's government authority's discretion to determine the nature of any given discipline. And we provided this illustration because, for a number of reasons. I think one of the ones that's very important in this context is, of course, my friend and beloved friend Stone v. Frank's decision in 1980. One of the things that Stone said, the very text that we asked you to take at its first, said, Stone is not the case where a school has attempted to incorporate this into its curriculum. That's Stone v. Brock v. Brock, and Stone is not. And so you can see by yourself now, by Stone's day, by its own terms, in this case, it's self-distinguishing. And it's distinguishing in another way, which is, you've got declarations from all of our school board defendants in this case saying, we do not intend to implement this H.B. 71 law in the way that you implemented the Stone law. There was an issue there in Stone v. Frank. That's important because what they're telling you is, right, whatever the state of the law is, it's supposed to be pro-Stone and pro-Stone. Whatever that is, this is not Stone. And that's why, again, you know, you pointed out in H.B. 9 of our Open Supreme Law Law, where you give you two citations that are, I think, probably the most important citations for this court in this case. One is Chief Judge Elwark's decision for the court in the new code dialysis case from 2019. The second is that it grants pass from the Supreme Court a couple of terms ago. Both of those cases stand for the proposition that when you've got old precedents that rests on bad doctrine, you don't extend that precedent to new facts, to new laws, to new challenges. And that's just one of the other ones. I think you weighed time. You were welcoming questions. I did weigh my time, yes. As I see it, the test here is history, and I'm not a historian, but I greatly respect Professor McConnell, whose scholarship was cited favorably in Kennedy. I think he wrote the dissent that became the Tenth Amendment, Supreme Court majority in Summer. And he said this law is like Kentucky. Quote, the state legislature is singling out a particular religious text to be displayed in a way that's not curricular or pedagogical but reverential. So my question to you is, we were gifted with a lot of faith-based amici, and I think every single one, every single faith-based amici with thousands of participants, like the National Council of Jewish Women, has said that Louisiana cannot officially privilege the Protestant translation over the one that the Torah gives that acknowledges the special covenant between the God of Israel and Jews. Can you think of any rabbinical authority or any authority in this record that accepts how Louisiana has preferred a Protestant translation than a mixed language in the Torah? So, Judge Jenkins, there's a lot packed in there. Let me hit first the amici. I think if you read my friends' amici on their certificates, I ask you to read the amici on our certificates, too. Take Professor Halperin, for example, that addresses the discussion of whether this is a sectarian or non-sectarian text, or whether it refers to one denomination being the other. The second thing I'd say to that, Judge Jenkins, is look at ROA 1748, footnote 18. This is the district court's decision. The district court itself passed on this entire question of whether this is a sectarian text or not, and whether there's discrimination in the sense that you've identified. And so I think the court doesn't have to address it. The last thing I'd say to that, Your Honor, is, I mean, as we lay out in our briefs, the text here is identical to the text in Van Orden. You know from Justice Breyer's concurrence in Van Orden, the way this text was generated was like a truly ideal process. All stakeholders involved chimed in. And that's that. Judge Jenkins, I don't want to get wrapped around the wheel on this specific question, because I don't think it ultimately matters in the end. And that's for one legal reason, which is I think the thrust of the question, at least in my time as opposed to that exact argument, comes from the Supreme Court's Larson decision, which is whether the government is basically preferring one religion over another. Look at Scribner 13 in Lynch v. Stalin, which attacks that specific argument, this idea that affirmation occurs when a government simply opposes one symbol or display that is associated with one religion. My specific question, can you think of any rabbinical authority that accepts the Protestant translation over the Torah? That's just a straightforward single question. In America, the government puts up a cross. Sure, that's associated commonly with Christianity, right? But there's no argument that just because it's associated with Christianity, the government has thereby unconstitutionally discriminated against all other religions. And that's why I think it matters, Your Honor, because if you take their argument to the plausible conclusion that it's a discrimination argument, no government could ever oppose a religious symbol. Faith in humanity has already been declared, right? I mean, that is plain and simple on their view. And what is wrong? American Legion is wrong. Lynch v. Stalin is wrong, correct? Because all of those are commonly associated with a particular religion and may not be associated with others. Ms. Draganjaga, one of the examples in your brief, or somewhere in the record, is a mock poster featuring Justice Ginsburg about the most important documents to humanity, Magna Carta, Declaration of Independence, Ten Commandments. Did anyone take note when Justice Ginsburg made that speech whether she was referring to the Torah's Ten Commandments as opposed to some other translation? No, Justice Ginsburg, and I think that's for a good reason, which is that at the Supreme Court it's recognized, you know, in cases like the American Legion, the Ten Commandments, like, generally have the same ten commandments, as the first written law obviously has historical relevance to our religious system. And if you look at Justice Ginsburg's words in her writing, I think that's a great example because that's a book she published in 2016 called My Own Words, what we reproduced there, and it was the very first of her own words that she reproduced in her book was an article that she wrote as a student, in which as a student, Justice Ginsburg recognized that, you know, there are obviously many great foundational documents in our nation's history. One of them happens to be the Ten Commandments. And our fundamental point here is, like, a legislature in Louisiana, a legislature in Texas, absolutely is well within its right to say, we want to actually teach our students about foundational documents. And I think that's exactly what the Supreme Court was getting at when it said that the Ten Commandments have historical significance in our legal system. On that question and answer, I mean, I think this cuts both ways, but I think the Supreme Court of the Frees, of course, does have Moses with the tablets, but it also has Muhammad with the Koran. Would courts have to intervene if the city in Louisiana decided to require that the Koran was posted with its universal precepts, including the statement, Allah, no god but him? Or would your logic mean that around the country, cities and states, that see there to be a universal justice and truth? In that phrase, that's fine. Your Honor, the civil and Louisiana laws are absolutely opposed to this right, and that we have to do our part in highlighting lawgivers in our nation's history that, unfortunately, we're going to end. But with religious scripture like that, Allah, no god but him? Absolutely, Your Honor. And I think, like you're saying, the way I approach that question is to start with what we know to be the test of authenticity, which is to look at history and tradition. Now, I'd very much dispute whether that means to look at hallmarks of what was traditionally understood to be the establishment of religion. But however you look at that question, you look at it as an art of history. And I think the way I would start that analysis is to say, well, does that depiction of the Koran and the Prophets in here reflect any of the hallmarks that were outlined in the Apollo article in just source-assured concurrence? If you haven't had a chance to look at it, how do you convince me that Judge Harlan's decision that he wasn't right? If you look at it, it's poor. What he's getting at there is, obviously, the test of authenticity. You look at these hallmarks, and that's our starting point. So, you know, Judge, I think I agree with that. And I ask, does this look like a government coercing somebody to attend church, punish them for not attending church? The sorts of hallmarks that our Founders understood when this country ratified the First Amendment. Well, I like this dialogue, and I don't mean to interrupt if others have questions, but what's the limiting principle then? If the hallmarks suggest that's fine, could the schools start each day by reading the Ten Commandments? And more importantly, perhaps, that's one hypothetical. The second one would be, could you not just post as posters, but then answer student questions, teach, proselytize? Where on the spectrum do we begin to say no? Because I think a football coach after a dean is a lot different than every hour of every day, all year, that dot text, scripted text facing students. So Judge Jenkins, the way I think to answer that question is to say, the patient standard is your finding in this case. I think there will be hard pieces at the heart of the case that the Court might have to address in the next part of our challenge. I think you can leave those pieces for another day. Here's how I draw the line at a certain point, at least for this case, which is to say, you have a line of precedent in scholarship that talk about the displays of religious symbols by the government, on one line. On the other line, you have a line of cases like Kennedy, like this Court's decision in Brock v. Perry, that talks about coercion to engage in religious exercise. And I think that's an important line to draw, at least for purposes of this case, because all we're talking about here is perhaps the display of religious symbols. If I could give you the scholarship and the precedence on that line of cases, I think we should look at, just to start, 2003, your decision in Briggs v. Mississippi. That's a case where, as this Court said, coercion doesn't flow just by the government's display of religious symbols. The scholarship? Oh, sorry. I thought you were saying something. Well, let me just give you the scholarship precedence, and the Barclay article, and then the McConnell article, and then all those that are kind of out in the injustice force, which is surely concurrent, say that there's no history of anyone at the founding thinking that the establishment clause would bar the display of religious symbols. I have some questions about your understanding of Kennedy v. Burns in the school district. The Court said that, going forward, we're going to reference historical practices and understanding. And it seems to me that if we do that, we have to look at dates are important, what was going on around, between before and after those dates, and what was actually happening. My starting point, I guess, was the New England Primer. That was published in Boston by a Boston, Massachusetts publisher at a time where the state of Massachusetts had a favored religion that was a Puritan religion, is my understanding. Is that correct? Right. I think that's right. There's certainly a reference to that a little back there. Yes. So, I guess the Louisiana statute itself, and at least when the Amicus briefs and other things talk about how many copies of the New England Primer were sold. Well, to me, that's not helpful information because we don't know how many of those copies were sold at a time in Massachusetts where it was lawful to have religious texts in the schools from the favored religion. And actually, the New England Primer was itself a Puritan-based tool to teach Puritan children. So, I don't understand how knowing how many texts altogether the New England Primer had sold tells us what the practices were. And so, what is there evidence of about that Primer and other similar Ten Commandments containing books or whatever that were used in not private, not religious, but public schools in states that had establishment clauses? Because as we know, the 14th Amendment wasn't ratified until 1868. So, let's start with looking at pre-1868. What evidence is there states that had establishment clauses or something similar had Ten Commandments to be used in public schools? So, Jennifer, if I could answer that question in two parts. The first part, I'll answer that directly, and in a second, I'll push back a little bit on whether this is the right way to look at history. The first question is on the factual matter. I don't think there's any dispute between our evidence and Congress' experts that the New England Primer, among other things for years, no doubt were used before it was established and after it was established. Now, no doubt, as it is in the 1900s and overall in the 1900s, that use tapered off, but there was no question that those were used in religious schools. So, how many were used by states that were disestablished in public schools? Yeah, I don't know that the record squarely reflects that. Maybe the record in the Texas case was less than one. And it's one thing to use them in a puritan school, which, you know, religious schools is quite another in a disestablished state to use in a public school. I don't know that our record speaks precisely to that question, but I can tell you that before and after it was established, these are in use. And if you haven't had a chance to look at the McGuffin's record, you should. I mean, there's some really great, I enjoyed reading a lot of the stories about how teachers used these enhanced proofs to show, like, ordinary principles that schoolchildren should learn every day. That raises another question. Even though the 14th Amendment was ratified in 1868, as late as, what was it, 1925, that was the first time the Supreme Court said any part of the First Amendment applied to the states. So, what do we do with that? Well, Your Honor, I think that's a legal matter. I don't know that it, you know, that that squarely answers the question whether the establishment laws as interpreted by cases like American Legion Kennedy bars the prohibition of acts of government, you know, government acts of displacement of religious elements. I'm just trying to figure out what the comments were and what the understanding was. Were people from 1886, I'm sorry, 1868 up until 1925, or ever since for that matter, when they were thinking about what would teach in public schools, were they operating under the thinking, well, I'm restrained at least by state establishment laws equivalent, even if I'm not by the federal law. What was the thinking in that? I want to answer that, Your Honor. The way I answer that is to say, it's not our burden to show that information. I'm just asking what the historical evidence is. I'm not asking that burden. I'm just asking what the historical evidence is. Right, and I don't think there's any historical evidence in this record that speaks squarely to that question, and if there were, that there was this apprehension that, oh, we might be working on our establishment laws. But I do think it's a legal question, but I respectfully don't think that's the right way to think about history. You read the Alonzo Kennedy that says, look at historical traditions and understandings. Read the next two sentences, right? That's what the court goes on to say. What we mean by that is we're going to look at whether the challenge of government action in a case reflects one of the hallmarks of a religious establishment. And I think that when you do that, and that's why we think Justice Gorsuch's list of hallmarks are helpful as a starting point, is because that's the mega list. But you're not saying, some of the briefing says that those six are it. If it's not in those six hallmarks, it's not covered by the establishment law. Do you agree with that? We've not taken that position, Judge Richmond. Okay. And that's the position that Judge Hardiman, and our position as well as Judge Hardiman, starts when he goes into our position, which I think is really good on that point. Is that it may not be an exhaustive list, but if a content in a particular case wants to expand that list, they have the burden of coming forward with historical evidence to show that there is actually another hallmark attached to the list. And so as a starting point, the reason we started there is because they ignored that test altogether in their district court briefing, and you only see them trying to satisfy the hallmarks analysis in their Hong Kong briefs, which I think is a dead giveaway today that they don't satisfy that test. That's true. I may be staring, but I'm not asking. Two quick questions. So if we were to, you would want us to hold that this is not right because we don't yet know what the displays would be. Is that correct? And then would we demand to dismiss the case if you were to prevail and not foreshadowing? That's what you would seek us to do. Is that correct? Yes, I think there are a number of ways to extend this test. One is to say, look at our position in the state of Hong Kong, which says cases like this necessarily are offensive in context specific. Okay, so we could do that. Could do that. Could the Louisiana schools put out the Torah portions next door to the other portions of the Ten Commandments and show different interpretations and wording of the Ten Commandments that they're displayed, if they wish? Absolutely. If you look at this report, and I've mentioned this before to you, we've got a footnote on that particular poster that says, this is one version of the Ten Commandments that was used in Babylon against Perish, but other great traditions have different versions. Other traditions have no version of the Ten Commandments at all, except in our original tradition. And did you forfeit your argument about the university or not? No, Your Honor, and I was surprised to see that in my friend's brief. So here's, let's think about it. Do you want to talk about it? You guys respond. Very good. Appreciate that, Your Honor. You know, in this report, we did not understand how this would be challenging an application of 1871 to universities and colleges. We know after this report issued a decision that it enjoined the activity and implementation of the law in all its applications. If you look early on, at around 1830, or our way, the district court actually ordered us to provide notice of its decision to all colleges and universities in Louisiana. And so that's why when we get up on the Hill, it goes into a little argument on it. One of the very last things I said to the panel is, colleges want to make this case about elementary schools, but the injunction in this case, and of course the rule in this case, the judicial challenge posture, applies just as well to more of these classrooms in LSU. Do you have a question? I have one follow-up, just because you stress so much the passivity. So I take it that your answer to my question about whether teachers could answer questions or teach is no. We're talking about passive display. But my difficulty with that is, in the cases you cited, none of those were the school context. And I thought Chief Justice Rehnquist,  and Scalia, all in Van Orden, finished Van Orden, using the history and tradition test, not the limit test, and said there has to be a limit, and the limit where we, the Supreme Court, will be vigilant is the classroom, because that's where the text, quote, 541 to 542, where they say, the Supreme Court reflecting on all of the school cases, and what they say is, in those cases, they identified the problem was coercion to engage in religious activity. That, I think, is an important way to understand, of course, the school cases, because if you look at all of those, you're talking about religious activity. I will mention, I think there may be hard questions on how a school didn't have a lot of right powers if they decided to add on to the display, but also, as an instruction, like before you saw in my hand, practice this instruction that says, I want to disrupt the way a student thinks about this topic. That's not the space for the patient to have a response. Thank you. Thank you. Thank you. Thank you. May I please be recorded? Like the Louisiana statute, the effects of this SB 10 provide anxiety-accompanying flaws, and nervously-exercised flaws, particularly in the spatial challenge context. Although SB 10 does not require contextualization of the Ten Commandments, neither does it forbid providing context similar to that which Louisiana's sentence suggests. Judge Simpkins, you have spoken in the Protestant version of the Ten Commandments that's been repeated,  and frequently. I expect you're going to hear some of that today. It's not supported, by the record. The testimony is from Dr. Green, who said,  I compared this to King James Version. I think they look similar. Therefore, the evil version of the Ten Commandments is wrong in the King James Version. What Dr. Green does not testify to is that there is no Catholic or Jewish translation in my book that is similar to these versions of the Ten Commandments. Are you uninterrupted? Okay. I'm not referring to Professor Green, although he is the only Ph.D. with a historian case. I'm looking at the language. King James Version, Protestant. I am the Lord thy God, thou shalt have no other gods before me. Torah, as quoted in the National Council of Jewish Women. I am the Lord, I the Lord am your God, who brought you out of the land of Egypt, the house of bondage. Well, let me give you a quick clarification. So, no one, there is no religious tradition that says, this is the complete and entire text of all of the Ten Commandments. Everyone is looking at the same original Hebrew scriptures. Everyone is looking at Exodus 1. There is no testimony in this record that this particular copy of the Ten Commandments is used by any domination. Okay, well, I guess my question is that in addition to official preference for particular scriptural texts, choosing one translation, the bigger First Amendment prohibition, I would think, is that the government can never disparage a religion. So, put aside the perplexity of a Jewish child, what about any child of a non-Abrahamic faith? A Buddhist child, a Hindu child, who believes in a multitude of deities. How could they not possibly feel confronted by a command that says there is only one God? And, your Honor, let me give you one more clarification before I ask you that. Yeah. I've heard you look at record page 1978 a couple of comparisons of Hebrew translations in the Bible that I think, excuse my French, can get very lonely. But, you ask about that. But, Texas legislature is determined that this is a historical document that agrees with the Supreme Court that the Ten Commandments are one of the foundations of our legal system that played an important role in American heritage. Does it include religious tolerance? Yes. Absolutely. But, out in Texas, where there's no contextualization, how would the child know this is about American history as opposed to the government favoring a Protestant text? Particularly, again, if you're of a belief that doesn't believe there's one creator God, there is no divine lawgiver, and there's no revealed religion. The whole context of the Ten Commandments is inconsistent with what their parents and their organizations are telling them until they get to school, government-mandated school, and they've got to look at a Protestant faith text. And I disagree with your interpretation of Protestant. But, what it does say is that these are Ten Commandments. The children learn what the Ten Commandments are. The children are required to believe, and the children are required to learn. And this work, trying to make history for Christians can be thoughtless. It's helpful. We are not writing on a blank slate trying to understand what was meant by an established church. Is the Pledge of Allegiance recited in Texas schools every day? It is, as a matter of state law, as I recall. That states a monotheistic view, right, a virtue of God in singular, not plural. Yes, Your Honor. One nation under God. We have the motto, as well as the leg, in Texas schools. And, again, this is important for Texas school children to be familiar with. It is not requiring them to formally believe in the Ten Commandments as much as required. But the Texas legislature should know it. So, when you look at the historical aspect of an established church, established churches are something that parents were very familiar with. Counselor, let me ask you about, you mentioned history and tradition. What role, if any, is there any role,  that an expert should ever play in these types of cases? And, if not, is there a preferred source for courts, in general, to study in terms of history and tradition? So, we can use this primarily legislative facts rather than judicial facts. The question of the meaning of the Ten Commandments, the meaning of the Establishment Clause, how the Establishment Clause would have been understood. That can be presented to the court in various ways. It can be presented through a meeting. It can be presented through experts. Here, I think everyone would probably agree that the source on history, as I'm claiming from Professor McCollum's article, it was cited by Justice Gorsuch in the Sherwood Comprise. My argument doesn't depend on those hallmarks of the Establishment being exclusive. My argument is more than that. There is some analogous 18th century practice that would have been recognized as a  of an established church. They were pretty exclusive. But I think what I want to acknowledge is that it can't identify these sort of 18th century analogs to say we think this attribute of an established church has any equivalent to the person who did it. Mr. Peterson, Mr. Agoniaga referred to this. The burden is on the plaintiffs to show that this is inconsistent with an establishment. So wasn't it their burden to show that some kind of  existed? Yes, Your Honor. We believe that the Third and Fourth Circuit are absolutely right in this regard that the plaintiffs' burden to prove a set of facts that would have historically been understood as an  of religion on the Third Circuit plaintiff must demonstrate that the challenge practice resembles one of these hallmarks of religious establishment. And then if the  can use that sort of initial burden to say this looks like or is supposed to be analogous to one of these known hallmarks of religious  At that point, the government can come back as a ruin and say it's not the same fact that it closely resembles an establishment or a known hallmark. Nonetheless, there's a long history that justifies this practice. I thought in the early, up through the Civil War, there was a lot of tension in New England particularly about Catholics versus Protestants about what was taught in school. Isn't that true? Wasn't there early on tension about I don't want you teaching my children this and the other side I don't want you teaching my children that. Wasn't that recognized there should be some established church that would have been recognized as an  by the founding generation that was very familiar with an  church in  and other practices of what an  church was. And really to say that's why they were established they need to be said essentially is that the pursing of a non-bacterian non-numeric area of Texas classroom is somehow equivalent of Texas stating that this is the official church of Texas. This is not an establishment of a church.  just to be clear, Stone said it was. So the entire argument turns on us as a circuit court feeling that we can look past it. My difficulty with that is the same line of  you heard me asking your co-counsel which is we have Chief Justice Rehnquist and the entire last two  say the limit for religious messages is in the classroom. We've been particularly vigilant in monitoring compliance with the establishment cause in elementary and  schools because that's where the text confronts elementary students every day. So my difficulty with thinking this is our opportunity to  Stone is it looks like the Supreme Court using history and  has at least left it up to them that it's still valid. So first we're not asking you to reverse Stone. I'll explain why in a second. I think it's important to say that in the Supreme Court's cases that Kennedy recognized that level of vigilance. I think that religious exercises and ceremonies as a coercive engagement in religion. There's a particular guard against coercion to engage in formal religious services in school environment that Kennedy acknowledges and continues to support. Now let's talk about Stone because I think it's undeniable that Stone is linked to money and in particular he's crucial in  the purpose of   The purpose of the problem is unusual. I've heard Justice Summers in the Supreme Court where the  Court has a fair bit of time to explain how it  works and what Justice Summers told us is that purpose is a very broad remark involving all different facts and circumstances involving every piece of objective data that an objective is  it's only one factor among many that goes into that analysis of  I would admit that this is unusual.  is very odd to say that you                                                                                                                                  get  lot                                                      what